UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE POLO/LAUREN COMPANY, L.P. and RALPH LAUREN HOME COLLECTION, INC.,

Plaintiffs,

-against-

707 LICENSING LIMITED,

Defendant.

Case No. 1:25-cv-10127 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs The Polo/Lauren Company, L.P. ("PLC") and Ralph Lauren Home Collection, Inc. ("RLHC" and, together with PLC, "PRL" or "Plaintiffs") bring this breach of contract action against Defendant 707 Licensing Limited ("707" or "Defendant"), alleging that 707 breached the parties' license agreement. *See generally* Dkt. 8 ("Am. Compl." or the "Amended Complaint"). 707 asserts four counterclaims for fraudulent inducement, fraudulent concealment, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See* Dkt. 27 ("Am. Answer" or the "Amended Answer") ¶¶ 84-145. Now before the Court is Plaintiffs' motion to dismiss 707's first, second, and fourth counterclaims pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim on which relief can be granted and Rule 9(b) for failure to plead fraud claims with the requisite particularity. Dkt. 30 ("Mot."). For the reasons that follow, the motion is GRANTED in part and DENIED in part.

**BACKGROUND**

The Court accepts the factual allegations in 707's counterclaims as true and draws all reasonable inferences in 707's favor for purposes of this motion. *See, e.g.*, *Judd Burstein, P.C. v. Long*, 797 F. App'x 585, 587 (2d Cir. 2019) (summary order); *CDC Newburgh Inc. v. STM Bags,*

*LLC*, 692 F. Supp. 3d 205, 217 (S.D.N.Y. 2023). The Court may also consider materials incorporated by reference in the counterclaims and documents that, although not incorporated by reference, are "integral to the [counterclaims]." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). In a breach of contract action, "the [pleading] is deemed to incorporate the contract by reference because the contract is integral to the . . . claim." *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 297-98 (S.D.N.Y. 2009); *accord Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011). The Court therefore relies on the excerpts of the license agreement submitted alongside the parties' briefing.[1]

## I. Factual Background

On or around August 9, 2022, PRL and 707 entered into a Polo Ralph Lauren License Agreement (the "License Agreement" or "Agreement"), which was effective April 1, 2022. Am. Answer ¶¶ 56-57. Under the Agreement, PRL licensed certain Ralph Lauren trademarks to 707 for use in the design, manufacture, marketing, development, distribution, promotion, importation, and sale of dog apparel and accessories (the "Licensed Products"). *Id.* ¶ 58. In exchange, 707 agreed, among other things, to pay certain guaranteed minimum royalties and an annual $100,000 staffing contribution. *See id.* ¶¶ 59, 70; *see also* Agmt. §§ 1.67, 18.3.

The Agreement regulated how and to whom 707 could sell the Licensed Products. Section 6.4 required 707 to sell Licensed Products to PRL, along with its affiliates, its retail stores, and its direct-to-consumer businesses (collectively, the "PRL Affiliates"), "to the extent

[1] Neither party submitted the full license agreement. Plaintiffs' excerpt includes section 1; portions of sections 2, 3, 18, and 19; and Exhibit D. Dkt. 32-1. Defendant's excerpt includes section 1; the same portions of section 2; additional portions of section 3; portions of section 6; and Exhibits A, B, and D. Dkt. 36-1. For ease of reference, the Court refers to both excerpts interchangeably as "Agmt."

of their respective requirements." Agmt. § 6.4(a). Additionally, Section 6.1 generally limited 707 to selling to specified "Approved Accounts" and required 707 to submit any proposed additional accounts to PRL for "Approval." *Id.* § 6.1(a); *see also id.*, Ex. D (enumerating "Approved Accounts"). The Agreement defines "Approval" to mean "written approval, authorization, consent[,] or determination" by PRL and provides that, whenever such approval is required, it "shall be given in [PRL's] sole discretion." *Id.* § 1.6.

PRL's Approval was likewise required for the design and development of the Licensed Products. "If [707] wishe[d] to propose a design or" "broad design themes and concepts with respect to . . . the Licensed Products," it was required to "submit its proposed design application, execution or presentation therefor . . . to [PRL] for Approval." *Id.* § 3.2(c); *see also id.* § 3.2(b). PRL could then, "in its sole discretion, disapprove any or all of the [p]roposed [d]esigns." *Id.* § 3.2(c). 707 was similarly required to seek and obtain PRL's Approval before "manufactur[ing] or caus[ing] to be manufactured any Licensed Product." *Id.* § 3.4(a).

In addition to these terms, the License Agreement contains a disclaimer provision. *See id.* § 2.9. Section 2.9 expressly "recognizes" the "many uncertainties in the business contemplated by th[e] Agreement," and accordingly provides that, except for representations expressly set forth therein, "no representations, warranties[,] or guarantees of any kind have been made to [707], either by [PRL] or its Affiliates, or by any Person acting on their behalf." *Id.* § 2.9. It further affirms that "no representation or warranty concerning the value of the Licensed Products or the prospects for the level of their sales or profits has been made by [PRL]" and that 707 "made its own independent business evaluation in deciding to accept the License and enter into th[e] Agreement." *Id.*

According to 707, however, PRL supplied information during the parties' contract negotiations that caused 707 to expect substantial sales through PRL's direct-to-consumer

channels (*i.e.*, PRL's stores and website). Am. Answer ¶¶ 64-70. Specifically, in a March 18, 2022 email, PRL employee Roman Glukhman ("Glukhman") told 707 that PRL had sold approximately 22,000 units the prior year across all of its stores, was then selling approximately 50,000 units, and had used a "conservative projection of around 50k units/yr with a CAGR [compound annual growth rate] of around 5% each year" in presenting the opportunity to senior management. *Id.* ¶ 66; *see also* Dkt. 31 ("Br.") at 8.[2] Glukhman also provided "conservative estimates" projecting direct-to-consumer retail sales ranging from $2.9 million in fiscal year 2023 to $6.8 million in fiscal year 2028. Am. Answer ¶ 67. 707 alleges that Glukhman described PRL's direct-to-consumer business as the "untapped potential" of its pet business and that these estimates informed the revenue projections used to set the Agreement's obligatory minimum royalties. *Id.* ¶¶ 68-69.

707 alleges that those "estimates" and "projections" were "fraudulent" because PRL knew at the time that it possessed substantial excess inventory of products that it had struggled to sell. *Id.* ¶ 71; *see id.* ¶¶ 72-74. According to 707, that inventory "consisted of products with substantially the same design[s]" as those 707 would sell under the License Agreement, *id.* ¶ 73, and would therefore significantly reduce PRL's and the PRL Affiliates' need to purchase new products from 707, *id.* ¶ 74. 707 further alleges that PRL intended to liquidate the excess inventory during the Agreement's term, including through steep discounts, and that PRL had

---

[2] 707 does not define "CAGR" in its Amended Answer or in its briefing. However, the "Court may take judicial notice of any fact that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Punin v. Garland*, 108 F.4th 114, 120 n.3 (2d Cir. 2024) (quotation marks and citation omitted); *see* Fed. R. Evid. 201(b)(2). The Court therefore takes judicial notice of the fact that "CAGR" is an acronym for "compound annual growth rate." *United States v. Guo*, No. 23-cr-00118 (AT), 2024 WL 3104538, at *4 n.2 (S.D.N.Y. June 24, 2024); *In re Young Broad. Inc.*, 430 B.R. 99, 133 (Bankr. S.D.N.Y. 2010) ("[T]he [d]ebtors' BCF compound annual growth rate ('CAGR') . . . ."); U.S. Sec. & Exch. Comm'n, *Glossary: COMPOUND-ANNUAL-GROWTH-RATE-CAGR*, Investor.gov, https://perma.cc/4YRT-4WHV.

already offered similar products to Approved Accounts without success. *Id.* ¶¶ 75-76. On that basis, 707 alleges that PRL concealed four related facts before the parties contracted: (1) PRL's existing excess inventory; (2) its plan to sell that inventory during the Agreement's term; (3) the resulting limited demand from PRL and the PRL Affiliates for products manufactured by 707; and (4) the prior rejection of similar products for purchase by Approved Accounts. *Id.* ¶¶ 85-88. 707 represents that it would not have entered the License Agreement had PRL disclosed those facts. *Id.* ¶¶ 89-92.

Two events post-dating the execution of the Agreement further inform 707's fraud theory. On January 6, 2023, Ralph Lauren North America ("RLNA"), one of the PRL Affiliates, ordered more than 10,000 units of Licensed Products from 707. *Id.* ¶ 77. 707 alleges that it began to purchase supplies and move those products into production, only for RLNA to cancel the order just over a month later. *Id.* ¶¶ 78-79. According to 707, RLNA explained on February 25, 2023, that its finance team had refused to approve the order because PRL already held excess inventory. *Id.* ¶¶ 79-80. Later, in August 2023, PRL offered to sell Licensed Products from that inventory to 707. *Id.* ¶ 83. 707 contends that these interactions confirm that PRL entered the Agreement with substantial inventory that it had not disclosed when providing 707 with "information, estimates, and projections . . . during [the parties'] negotiations." *Id.* ¶ 72.

Beyond the alleged failure to disclose, 707 pleads a broader course of conduct designed to prevent its Licensed Products from competing with PRL's excess inventory. In particular, 707 alleges that PRL required 707 to continue using existing designs for the Licensed Products despite poor sales, *id.* ¶ 128; refused for more than a year to approve sizing changes for certain Licensed Products, *id.* ¶ 130; declined to permit 707 to reduce its prices to match discounts offered on PRL's websites for Licensed Products, *id.* ¶ 133; delayed implementing regional price restrictions that 707 says were necessary to support higher prices in Asia mandated by the

Agreement, *id.* ¶¶ 135-36; and repeatedly delayed or withheld approvals and responses concerning 707's business plans, *id.* ¶ 139. 707 also alleges that, after it obtained an order for Licensed Products from Dillards, PRL refused to approve Dillards as a new Approved Account. *Id.* ¶¶ 140-42. The cited basis for PRL's refusal was that PRL products were not then sold at Dillards, even though, 707 alleges, Dillards was in fact selling such products at the time. *Id.* ¶ 142. According to 707, PRL exercised its contractual authority in this manner because allowing 707 to sell more Licensed Products would have interfered with PRL's efforts to liquidate its excess inventory. *See id.* ¶¶ 129, 132, 134, 138, 143.

## II. Procedural History

Plaintiffs commenced this action on December 5, 2025. Dkt. 1 ("Compl." or the "Complaint"). They filed the Amended Complaint on December 10, 2025, asserting a single claim for breach of the License Agreement. *See* Am. Compl. ¶¶ 51-55.

707 answered on February 10, 2026, and asserted four counterclaims, Dkt. 19 ("Answer"), the first, second, and fourth of which Plaintiffs moved to dismiss on March 3, 2026, *see* Dkt. 21. Rather than oppose the motion, 707 amended its Answer and counterclaims on March 24, 2026. *See* Am. Answer. Plaintiffs then renewed their motion to dismiss Counterclaims I, II, and IV on April 7, 2026. Mot.; Br.; Dkt. 32 ("Steiner Decl."). 707 opposed the renewed motion on April 29, 2026, Dkt. 35 ("Opp."); Dkt. 36 ("Isaac Decl."), and Plaintiffs replied on May 11, 2026, Dkt. 37 ("Reply"). The motion is fully briefed.

# LEGAL STANDARD

"[A] motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 202 (S.D.N.Y. 2020) (quoting *Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, No. 13-cv-07169 (LGS), 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014)). A

counterclaim is therefore subject to dismissal under Rule 12(b)(6) "to the extent that it 'fails to state a claim upon which relief can be granted.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110 (2d Cir. 2010) (alteration adopted) (quoting Fed. R. Civ. P. 12(b)(6)). On a motion seeking such dismissal, the Court "accept[s] the material facts alleged in the [pleading] as true and draw[s] all reasonable inferences in favor of the [nonmovant]." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 162 (2d Cir. 2025) (quoting *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 140 (2d Cir. 2023)). The Court need not, however, "accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'" *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). To survive dismissal, the counterclaim must "contain[] sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Counterclaims sounding in fraud must also satisfy Rule 9(b), which requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see JoySuds, LLC v. N.V. Labs, Inc.*, No. 22-cv-03781 (JPC) (OTW), 2023 WL 6548728, at *2 (S.D.N.Y. Oct. 9, 2023). Ordinarily, that means the pleading must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 187 (2d Cir. 2004)). Where, as here, a fraud claim rests principally on omissions, the particularity inquiry necessarily differs because "no act occurred" at a discrete time and place. *Odyssey Re (Lond.) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001) (summary order). In such a circumstance, the pleading still must

describe: "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Id.*

## DISCUSSION

### I. Choice of Law

As a threshold matter, the Court finds that New York law governs the counterclaims at issue. The License Agreement provides that it "shall be construed in accordance with and governed by the laws of the State of New York without regard to its conflict or choice of law rules." Am. Compl. ¶ 10. The parties likewise rely on New York law throughout their briefing and do not identify any competing body of law. *See generally* Br.; Opp.; Reply.

"In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law." *Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011) (footnote omitted), *aff'd*, 476 F. App'x 913 (2d Cir. 2012) (summary order). But where the parties agree that the forum state's law applies, "their consent concludes the choice of law inquiry." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 486 (S.D.N.Y. 2017) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)). Indeed, the parties' assumption in their briefs that New York substantive law governs constitutes "implied consent . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see, e.g.*, *PetEdge*, 234 F. Supp. 3d at 486 (applying New York law where party implicitly consented by citing exclusively to New York law); *Heath v. EcoHealth All.*, No. 23-cv-08930 (JLR), 2024 WL 5168072, at *3 (S.D.N.Y. Dec. 19, 2024) (same). The Court therefore applies New York law to 707's fraud and implied covenant counterclaims — the merits of which the Court turns to next.

## II. The Fraud Counterclaims

707's first two counterclaims sound in fraud and arise from the same alleged omissions. Although 707 identifies four allegedly concealed facts — (1) PRL's existing excess inventory, (2) its plan to liquidate that inventory during the Agreement's term, (3) the resulting limited demand from PRL and the PRL Affiliates, and (4) Approved Accounts' prior rejection of similar products, Am. Answer ¶¶ 85-88, 101-04 — the Court considers these allegations together under the umbrella of "existing excess inventory." While distinct, the alleged omissions are closely related and bear on the same underlying concern: that demand for 707's Licensed Products would be substantially lower than PRL's precontract projections suggested. Accordingly, the analysis that follows applies with equal force to each omission.

Counterclaim I alleges that PRL's omissions induced 707 to enter into the License Agreement, *see id.* ¶¶ 84-99, while Counterclaim II alleges that PRL's continued concealment induced 707 to perform under it, *see id.* ¶¶ 100-14. With respect to both counterclaims, 707 alleges that PRL had a duty to disclose because PRL possessed superior knowledge of its own inventory that was not readily available to 707. *See id.* ¶¶ 93, 110. Because these two counterclaims substantially overlap, the Court sets out the law governing both before separately addressing the merits of each.

"To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 189-90 (2d Cir. 2023) (quoting *Fin. Guar. Ins. Co.*, 783 F.3d at 402); *accord Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1182 (N.Y. 2018). Fraudulent inducement applies those requirements to a "misrepresentation or material omission . . . that induced [the

claimant] to enter into an agreement." *See Senior Health Ins. Co. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 525 (S.D.N.Y. 2018) (quoting *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 670 (S.D.N.Y. 2009)); *accord Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 606 (N.Y. 1999). A fraudulent concealment claim similarly requires knowledge, intent to defraud, reliance, and damages, but also requires a duty to disclose the concealed information. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 90-91 (2d Cir. 2005); *see also Schwatka v. Super Millwork, Inc.*, 965 N.Y.S.2d 547, 551 (N.Y. App. Div. 2013) ("A cause of action to recover damages for fraudulent concealment requires, in addition to allegations of scienter, reliance, and damages, an allegation that the defendant had a duty to disclose material information and that it failed to do so." (citation omitted)).

Reasonable reliance is essential to both fraudulent inducement and fraudulent concealment claims. *See Ambac*, 106 N.E.3d at 1182 ("Justifiable reliance is a 'fundamental precept' of a fraud cause of action." (quoting *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959))); *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 28 (N.Y. App. Div. 2014) (addressing "reasonable reliance" as "an element of both affirmative [fraud] and [fraudulent] concealment"). "In assessing whether reliance on allegedly . . . fraudulent misrepresentations is [reasonable], New York law takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *Thomas H. Lee Eq. Fund V, L.P. v. Grant Thornton LLP*, 586 F. Supp. 2d 119, 133 (S.D.N.Y. 2008).

In the context of a fraudulent inducement claim, "where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d

Cir. 1996) (citing *Danann*, 157 N.E.2d at 599); *accord Coraud LLC v. Kidville Franchise Co.*, 109 F. Supp. 3d 615, 619 (S.D.N.Y. 2015). Put differently, that disclaimer may render reliance unreasonable as a matter of law. In *Danann*, for example, the Court of Appeals explained that a party cannot allege reasonable reliance after it "has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded." 157 N.E.2d at 599; *see Basis Yield*, 980 N.Y.S.2d at 28 ("[W]here a written contract contains . . . a provision that the parties are not bound by or relying upon representations or omissions as to the specific matter, . . . a plaintiff [is] precluded from later claiming fraud on the ground of a prior misrepresentation as to the specific matter.").

While the disclaimer need not reproduce the alleged misrepresentation verbatim, "the substance of the disclaimer provisions [must] track[] the substance of the alleged misrepresentations, notwithstanding semantical discrepancies." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984); *accord IMG Memorial Fund 1, LLC v. First Landing Fund, LLC*, No. 21-cv-03263 (LGS), 2022 WL 826276, at *4 (S.D.N.Y. Mar. 18, 2022). "The specificity requirement is further relaxed when the contracting parties are 'sophisticated business people,' and the disclaimer clause is the result of negotiations between them." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 576 (2d Cir. 2005) (per curiam) (quoting *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 977 (N.Y. 1985)). Conversely, a general merger clause or an omnibus statement that no other representations were made does not, standing alone, bar a fraudulent inducement claim. *See FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) ("Standing alone, therefore, a general disclaimer (still less a general merger clause) is not sufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated investor."); *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) ("[E]ven when the contract contains an omnibus

statement that the written instrument embodies the whole agreement, or that no representations have been made, a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud." (quotation marks and citation omitted)); *see also Phoenix Cos., Inc. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 596 (S.D.N.Y. 2021) ("[W]here the parties' agreement includes a merger clause, courts look to the entire context of the transaction to determine whether a plaintiff's reliance on an extra-contractual representation is reasonable." (quotation marks and citation omitted)); *Brand Engagement Network, Inc. v. AFG Cos., Inc.*, No. 25-cv-02245 (CM), 2026 WL 658521, at *6 (S.D.N.Y. Mar. 9, 2026) (distinguishing a general integration clause from provisions that, read together, specifically disclaimed reliance on the subject of the alleged fraud).

"[T]here is one instance in which even an explicit waiver will not be given effect — 'when the facts are peculiarly within the knowledge of the party invoking the disclaimer.'" *Aetna*, 404 F.3d at 576 (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995)); *see Basis Yield*, 980 N.Y.S.2d at 28; *Danann*, 157 N.E.2d at 600. This "peculiar knowledge" exception does not apply merely because one contracting party knows something that the other does not. Rather, it protects a party that could not reasonably discover the truth through "ordinary intelligence" or "due diligence." *Danann*, 157 N.E.2d at 600; *see id.* ("[I]f . . . the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth . . . he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." (citation omitted)); *McBeth v. Porges*, 171 F. Supp. 3d 216, 228 (S.D.N.Y. 2016) ("Facts are peculiarly within a party's knowledge, however, only if they 'could not have been discovered with the exercise of due diligence.'" (quoting *Coraud*, 109 F. Supp. 3d at 620)). "New York courts have stated that ordinary intelligence includes, 'at the very least, a

duty to inquire.'" *Vinci Brands LLC v. Coach Servs., Inc.*, No. 23-cv-05138 (LGS), 2025 WL 2771621, at *4 (S.D.N.Y. Sept. 29, 2025) (quoting *Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d 132, 135 (N.Y. App. Div. 2005)).

In the fraudulent concealment context, the special facts doctrine — a doctrinal counterpart to the peculiar knowledge exception — governs whether an omission is actionable to begin with. That is because "[a] cause of action for fraudulent concealment requires . . . an allegation that the defendant had a duty to disclose material information." *Logan v. Playa Bowls, LLC*, No. 25-cv-06640 (DLC), 2026 WL 810521, at *6 (S.D.N.Y. Mar. 23, 2026) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011)). And "[i]n the context of a business transaction, the duty to disclose arises . . . 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *TVT Records*, 412 F.3d at 91 (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *accord Hurlock v. Kelsier Ventures*, No. 25-cv-03891 (JLR), 2026 WL 2922942, at *19 (S.D.N.Y. Sept. 29, 2026). Like the peculiar knowledge exception, "the special facts doctrine does not apply when the information not disclosed could have been easily obtained through duly diligent inquiry or by the exercise of ordinary intelligence." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12-cv-07372 (LJL), 2020 WL 5518146, at *91 (S.D.N.Y. Sept. 14, 2020) (quotation marks and citations omitted).

Finally, a party cannot evade an otherwise effective disclaimer simply by relabeling the disclaimed representation as an omission. In *Psenicska v. Twentieth Century Fox Film Corp.*, the Second Circuit affirmed dismissal where plaintiffs' purported fraudulent concealment theory merely "restyl[ed] their allegations of misrepresentation as allegations of omission." 409 F. App'x 368, 372 (2d Cir. 2009) (summary order) (citation omitted). The relevant inquiry therefore remains substantive: whether the alleged omission concerns a distinct fact for which

the law imposed a duty to disclose, or instead concerns the same matter as the representation on which the claimant expressly agreed it would not rely. *See id.*; *see, e.g.*, *Kamboj v. Bajaj*, No. 13-cv-00622 (BMC), 2013 WL 12363611, at *3 & n.2 (E.D.N.Y. Aug. 28, 2013) (granting motion to dismiss where plaintiff "repeat[ed] many of his affirmative misrepresentation claims as omissions"); *cf. Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 105 (E.D.N.Y. 2014) ("[A]lthough couched as failures to disclose, the alleged omissions merely restate plaintiffs' core misrepresentation claim.").

**A. Fraudulent Inducement (Counterclaim I)**

Counterclaim I fails because 707 cannot plausibly allege reasonable reliance on the alleged omissions in light of the License Agreement's express disclaimer. Section 2.9 begins by recognizing that "there are many uncertainties in the business contemplated by th[e] Agreement" and provides that, except for representations "expressly set forth" in the Agreement, "no representations, warranties or guarantees of any kind have been made to [707]." Agmt. § 2.9. More specifically, it states that "no representation or warranty concerning the value of the Licensed Products or the prospects for the level of their sales or profits has been made" and that 707 "made its own independent business evaluation in deciding to . . . enter into th[e] Agreement." *Id.* Section 19.13 reinforces that allocation of risk by providing that prior "oral statements," "representations," and "written matter" not contained in the Agreement "shall have no force and effect." *Id.* § 19.13.

Those provisions address the substance of the alleged fraud. Hoping to sidestep the License Agreement's express disclaimers, 707 argues that its claim concerns not the allegedly fraudulent "projections that PRL provided to 707 during the[ir] negotiations," Am. Answer ¶ 71, but rather the fact of PRL's excess inventory. *See* Opp. at 9. Representations about PRL's

inventory, the argument goes, are not specifically disclaimed by Section 2.9, thereby rendering 707's reliance reasonable. *See id.* at 2.

This argument, however, overlooks that the Court's analysis must prioritize substance over linguistic parity. *See Grumman*, 748 F.2d at 735 (holding that a disclaimer need not use identical language where its "substance . . . tracks the substance of the alleged misrepresentations"); *Brand Engagement*, 2026 WL 658521, at *6-7 (finding disclaimer sufficiently specific despite "semantical discrepancies" where the agreement placed responsibility for evaluating the company's business and prospects on the claimant). Here, 707's own allegations explain why PRL's inventory mattered: the inventory meant that PRL and the PRL Affiliates would purchase fewer Licensed Products from 707, PRL would compete with 707 by liquidating similar products at discounted prices, and Approved Accounts would have less demand for 707's products. *See* Am. Answer ¶¶ 74-76, 86-88, 90-92, 94. Those allegations concern the very "prospects for the level of [the Licensed Products'] sales or profits" that Section 2.9 expressly removes from the universe of matters on which 707 could rely. Agmt. § 2.9. Indeed, 707 alleges that PRL's inventory rendered "fraudulent" the sales information and projections on which 707 relied in negotiating the minimum royalties it would owe PRL under the Agreement and in evaluating the transaction more generally. Am. Answer ¶ 71; *see id.* ¶¶ 64-74. The alleged omission and the expressly disclaimed subject are therefore not separate in the manner 707 suggests.

707 also cannot avoid the Agreement's specific disclaimer by reframing the claimed deception as an omission. *Psenicska v. Twentieth Century Fox Film Corp.* is instructive. There, plaintiffs took issue with the use of their images in the film *BORAT*, a film that "tells the story of a fictional Kazakh television personality, Borat, sent to the United States to report on American culture," and which "employs as its chief medium a brand of humor that appeals to the most

childish and vulgar in its viewers." *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07-cv-10972 (LAP), 2008 WL 4185752, at *1 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009) (summary order). Plaintiffs sought to avoid an express disclaimer of "reliance on any promises or statements made by anyone about the nature of th[e] [f]ilm" by "restyling their allegations of misrepresentation as allegations of omission." *Id.* at *6 (quotation marks and citation omitted). Specifically, plaintiffs took issue with defendants' representation that *BORAT* would be a "documentary about the integration of foreign people into the American way of life," *id.* at *1, arguing principally that the statement was false, and, in the alternative, that defendants "had a duty to disclose the nature of the film," *id.* at *5-6. The district court rejected the effort because the omitted information concerned the same subject upon which plaintiffs had agreed not to rely. *Id.* at *6-7. The Second Circuit affirmed and held that "[h]owever plaintiffs cast their claims, dismissal was compelled by the . . . disclaimer of reliance." *Psenicska*, 409 F. App'x at 372. So too here. Whether described as an inaccurate sales projection or as an undisclosed condition that allegedly rendered that projection inaccurate, 707's theory depends on the proposition that it relied on PRL's information to assess likely sales and profits. Section 2.9 expressly disclaims such reliance.

707's appeal to the peculiar knowledge exception, *see* Opp. at 10-11, likewise fails to move the needle. 707 alleges that PRL had "superior knowledge" of its inventory "that was not readily available to 707." Am. Answer ¶ 93. But that conclusion alone does not establish the exception. The peculiar knowledge exception applies where the truth could not reasonably have been discovered through ordinary intelligence or due diligence. *See Danann*, 157 N.E.2d at 600; *McBeth*, 171 F. Supp. 3d at 228. That is to say, the doctrine does not relieve a sophisticated contracting party of the obligation to protect itself where it has a practical means of doing so. *See O.F.I. Imports Inc. v. Gen. Elec. Cap. Corp.*, No. 15-cv-07231 (VEC), 2016 WL 5376208, at

*6 (S.D.N.Y. Sept. 26, 2016) ("Th[e] [peculiar knowledge] exception is stringently applied 'when the contracting parties are sophisticated entities' and does not apply 'where the plaintiff had a low cost alternative such as insisting that the written contract terms reflect any oral undertaking on a deal-breaking issue.'" (internal quotation marks omitted) (quoting *Sol Grp. Mktg. Co. v. Lines*, No. 14-cv-09929 (SHS), 2016 WL 205444, at *5 (S.D.N.Y. Jan. 15, 2016))); *see, e.g.*, *Banque Arabe*, 57 F.3d at 156-57 (finding no reasonable reliance where allegedly concealed information was "readily accessible to any interested party who cared to make inquiry"); *Neely v. RMS Residential Mortg. Sol., L.L.C.*, No. 12-cv-01523 (JS) (AKT), 2013 WL 752636, at *13 (E.D.N.Y. Feb. 26, 2013) (concluding that the peculiar knowledge exception did not apply where plaintiff "fail[ed] to further inquire" as to the allegedly concealed fact); *Psenicska*, 409 F. App'x at 371-72 (declining to apply the exception where plaintiffs had not "tak[en] any steps," including "cost-free steps," "to confirm the oral representations on which they claim to have relied").

The Amended Answer alleges no such diligence by 707. Nor does 707 allege that due diligence could not have revealed PRL's excess inventory. This apparent failure to conduct diligence is particularly significant because 707 claims that projected direct-to-consumer sales "were critically important to" its decision to enter the Agreement and formed the basis for the minimum royalties negotiated by the parties. Am. Answer ¶ 65; *see id.* ¶¶ 64-70. A party that considered those sales projections central to the bargain could have sought information during negotiations that bore on them or contracted for protection against the risk that they would not materialize. Instead, 707 agreed both that PRL made no representation concerning sales prospects and that 707 had conducted its "own independent business evaluation." Agmt. § 2.9. Under these circumstances, the peculiar knowledge exception does not render reasonable 707's reliance on the disclaimed subject matter.

In sum, 707 alleges that PRL's undisclosed inventory made the licensed business materially less valuable than PRL's precontract information suggested. But 707 expressly agreed that PRL made no representation concerning sales or profit prospects and that 707 would evaluate those prospects for itself. New York law does not permit 707 to accept that allocation of risk and then plead reasonable reliance on the same economic expectations by characterizing the alleged defect in those expectations as concealed inventory. Counterclaim I is therefore dismissed.

**B. Fraudulent Concealment (Counterclaim II)**

Counterclaim II fails for substantially the same reasons as Counterclaim I and for the additional reason that 707 does not adequately plead a duty to disclose. Counterclaim II alleges that PRL's continuing concealment of its excess inventory caused 707 to incur costs in performing the Agreement, including costs associated with "designing, manufacturing, marketing, distributing, and selling Licensed Products." Am. Answer ¶ 105; *see id.* ¶¶ 101-14. That alleged concealment, however, concerns the same information underlying Counterclaim I. *Compare id.* ¶¶ 85-88, *with id.* ¶¶ 101-04. For the reasons explained above, Section 2.9 forecloses reasonable reliance on those sales expectations. *See supra* Section II.A. Counterclaim II therefore fails on reliance alone.

Moreover, Counterclaim II independently fails because 707 has not adequately pleaded that PRL owed it a duty to disclose the allegedly concealed information. Because the parties here lack the fiduciary relationship necessary to establish such an obligation, 707 invokes the special facts doctrine. *See* Opp. at 14-17; *see also Meeker v. McLaughlin*, No. 17-cv-05673 (SN), 2019 WL 1437518, at *2 (S.D.N.Y. Mar. 31, 2019) ("The special facts doctrine holds that, 'absent a fiduciary relationship between the parties, there is nonetheless a duty to disclose when one party's superior knowledge of essential facts renders a transaction without disclosure

inherently unfair.'" (quoting *Greenman-Pedersen, Inc. v. Berrman & Henigar, Inc.*, 14 N.Y.S.3d 20, 21 (N.Y. App. Div. 2015))). Under that doctrine, the concealed information must not have been "readily available" to the claimant, and the non-disclosing party must have known that the claimant was "acting on the basis of mistaken knowledge." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)). Put differently, "[a] disclosure duty ripens only when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of a material fact." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995); *accord Herzfeld v. JPMorgan Chase Bank, N.A.*, 354 F. App'x 488, 489 (2d Cir. 2009) (summary order).

707 does not sufficiently plead either requirement. First, although the Amended Answer recites that PRL's inventory information "was not readily available to 707," Am. Answer ¶ 110, it alleges no facts showing why that was so. 707 does not allege that it asked PRL about existing inventory or otherwise attempted to determine whether PRL already possessed products that could affect demand for 707's products. That omission matters because information is not treated as peculiarly within another party's knowledge where the claimant could have obtained it "through the exercise of ordinary intelligence." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 263 (2d Cir. 2021) (quotation marks and citation omitted); *McBeth*, 171 F. Supp. 3d at 228 (observing that special facts doctrine does not apply where information could "have been discovered with the exercise of due diligence" (citation omitted)). And, in an arm's-length transaction between sophisticated parties, ordinary diligence includes at least making an inquiry into a matter the party considers material. *See Vinci Brands*, 2025 WL 2771621, at *4-5 (finding special facts doctrine inadequately pleaded where the counterclaimant did not allege that it asked about the allegedly concealed information and "fail[ed] to provide any reason that [the

non-disclosing party] had a duty to offer that information unprompted"); *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 75 (N.Y. App. Div. 2012) ("To sustain [plaintiff]'s fraud cause of action, we would have to . . . close our eyes to [plaintiff]'s sophistication; to [plaintiff]'s disclaimer of reliance on [defendant] for advice or on any extracontractual representations; . . . [and] to [plaintiff]'s ability to protect itself through the exercise of due diligence[.]"); *see also Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 15-cv-04428 (ALC), 2018 WL 4278286, at *25 (S.D.N.Y. Mar. 26, 2018) ("It is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." (alteration adopted) (quotation marks omitted) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997))).

As discussed *supra* in Section II.A, the absence of any inquiry from 707 is especially significant given its own assertions about the materiality of the allegedly concealed information. 707 claims that PRL's expected direct-to-consumer sales were "critically important" to its decision to contract with PRL, Am. Answer ¶ 65, and that those projections informed the minimum royalties that 707 was obligated to pay under the Agreement, *see id.* ¶ 68. Despite the alleged significance of those prospective sales, however, the Agreement itself contemplated the sale of Licensed Products to PRL and the PRL Affiliates only "to the extent of their respective requirements." Agmt. § 6.4(a). 707 agreed to that language and, having done so, does not allege that it sought information concerning PRL's or the PRL Affiliates' existing inventory before undertaking the costs it now seeks to recover. If PRL's inventory was material because it bore directly on expected demand, "ordinary intelligence — i.e., prudent business practice — should have prompted" 707 to inquire about it. *Vinci Brands*, 2025 WL 2771621, at *5 (quotation marks omitted). The conclusory allegation that the information was not readily available does

not substitute for facts showing that reasonable inquiry would have failed. *Cf. Weinstein v. Rexall Sundown, Inc.*, No. 21-cv-05378 (JS) (ARL), 2024 WL 4250353, at *5 (E.D.N.Y. Aug. 26, 2024) (observing that the peculiar knowledge exception "is not a license to make purely speculative allegations with no factual foundation" (citation omitted)).

Second, the Amended Answer does not adequately allege that PRL knew 707 was operating under a mistaken understanding about PRL's inventory. 707 alleges only that "PRL knew that 707 would not have incurred costs related to its performance of the License Agreement if 707 was aware of PRL's excess inventory of Licensed Products[.]" Am. Answer ¶ 111. But knowing that another party lacks information is not the same as knowing that the party holds an affirmative mistaken belief. As the court explained in *Hegde v. Montefiore Medical Center*, "[i]f acting based on not having knowledge were the same thing as acting based on mistaken knowledge, then the bar to establish a duty to disclose would collapse entirely." No. 25-cv-04222 (AS), 2026 WL 17237, at *3 (S.D.N.Y. Jan. 2, 2026). PRL's awareness that 707 lacked information about PRL's inventory levels is therefore insufficient to trigger a duty to disclose.

707 argues that PRL's sales information and projections supplied the necessary mistaken understanding. *See* Opp. at 15-16. That argument, however, underscores the problem rather than curing it. If 707's mistaken understanding was that demand for the Licensed Products would track PRL's projections, Section 2.9 expressly forecloses reliance on that understanding. If instead the relevant mistaken understanding concerned PRL's actual inventory level, the Amended Answer does not identify what 707 believed that inventory level to be, who or what communicated that belief to PRL, or facts showing that PRL knew 707 held that belief. *See Richards v. AXA Eq. Life Ins. Co.*, No. 06-cv-03744 (PAC), 2007 WL 3084968, at *5 (S.D.N.Y. Oct. 22, 2007) ("Defendant obviously and unavoidably possessed superior knowledge regarding

its rating policies that was not readily available to [p]laintiff. That is insufficient, however, as the facts pled in the [c]omplaint do not support a claim that [d]efendant knew [p]laintiff was acting on the basis of mistaken knowledge."); *Loma Linda Univ. v. Smarter Alloys, Inc.*, No. 19-cv-00607, 2020 WL 5549986, at *11 (W.D.N.Y. Aug. 14, 2020) ("[Counterclaimant] has not plausibly alleged that [non-disclosing parties] knew [counterclaimant] acted on mistaken knowledge."), *report and recommendation adopted,* 2020 WL 5544329 (W.D.N.Y. Sept. 16, 2020). Instead, 707 simply alleges that PRL knew facts about its own inventory that 707 did not know. That is not enough.

707's proposed amendment does not cure that defect. In its opposition brief, 707 requests leave to amend the Amended Answer to add that "PRL knew that 707 was acting on the basis of mistaken knowledge concerning PRL's excess inventory of Licensed Products." Opp. at 16; *see* Dkt. 36-2 ¶¶ 93, 110. As a threshold matter, 707 cannot cure its pleading deficiency by adding a conclusory allegation in its opposition brief. *See Town & Country Adult Living, Inc. v. Vill./Town of Mt. Kisco*, No. 17-cv-08586 (CS), 2019 WL 1368560, at *14 (S.D.N.Y. Mar. 26, 2019) ("It is well established that a [pleading] may not be amended by the briefs in opposition to a motion to dismiss." (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998))). Setting that aside, that proposed language merely recites the legal standard; it adds no facts identifying 707's purported mistaken belief, explaining how PRL became aware of that belief, or showing that the inventory information could not have been obtained through reasonable inquiry. *See Hegde*, 2026 WL 17237, at *3; *see also Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 900 (E.D.N.Y. 2018) (dismissing fraudulent omission claim where there were no "facts from which an inference can be drawn that [d]efendant *knew* [p]laintiff was acting on the basis of the mistaken knowledge"). Simply put, 707's proposed amendment is not enough.

In short, because Counterclaim II rests on the same disclaimed sales expectations as Counterclaim I and additionally fails to plead facts establishing a duty to disclose, it, too, is dismissed.[3]

**III. Breach of the Implied Covenant of Good Faith and Fair Dealing (Counterclaim IV)**

Counterclaim IV alleges that PRL breached the implied covenant of good faith and fair dealing by exercising its discretionary approval authority under the License Agreement in bad faith to undermine 707's ability to market and sell the Licensed Products. Am. Answer ¶¶ 125-27. According to 707, PRL sought to prioritize its own efforts to liquidate excess inventory, thereby depriving 707 of the benefit of the parties' bargain. *Id.* ¶¶ 124, 143-44.

Under New York law, "implicit in every contract is a covenant of good faith and fair dealing, which encompasses any promises that a reasonable promisee would understand to be included." *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995) (citation omitted); *accord JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022). This includes "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)); *accord Titus v. UMG Recordings, Inc.*, No. 23-cv-00015 (JLR), 2023 WL 8039622, at *12 (S.D.N.Y. Nov. 20, 2023). At the same time, the implied covenant "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22, 23 (N.Y. App. Div. 2003); *accord Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005).

[3] The Court need not reach the parties' arguments regarding the sufficiency of 707's pleadings under Rule 9(b), *see* Br. at 9-10; Opp. at 12-13, because the counterclaims fail on the merits.

"However, under New York law, even where a 'contract contemplates the exercise of discretion,' the party with discretion is bound by the implied covenant 'not to act arbitrarily or irrationally in exercising that discretion.'" *Danomalous Prods., LLC v. Scholastic Ent. Inc.*, No. 24-cv-08041 (AT), 2026 WL 866836, at *7 (S.D.N.Y. Mar. 30, 2026) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)); *accord Fishoff*, 634 F.3d at 653. Such is the case even where the contract provides a party with the right to act in its "sole discretion." *See Zest Anchors, LLC v. Biomet 3i, LLC*, No. 23-cv-07232 (JLR), 2025 WL 1591707, at *7 (S.D.N.Y. June 5, 2025) ("It is not the law that contracts providing a party with the right to act in their sole discretion can never be subject to claims for implied breach of the covenant of good faith and fair dealing."); *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 505 (S.D.N.Y. 2021) ("[E]ven where a contract permits discretion to a contracting party, that party may not exercise that discretion arbitrarily or irrationally.").

That principle applies here. PRL retained substantial control over 707's ability to develop and sell Licensed Products. The Agreement defines "Approval" to mean a written determination by PRL and provides that, whenever PRL's Approval is required, it "shall be given in [PRL's] sole discretion." Agmt. § 1.6. Section 3.2 likewise permits PRL, "in its sole discretion," to reject 707's proposed designs. *Id.* § 3.2(c). Yet that same provision requires PRL to remain "reasonably available for consultation" concerning modifications necessary to obtain PRL's Approval. *Id.* § 3.2(d). Section 3.4 similarly gives PRL discretion to reject prototypes, while requiring PRL to explain a rejection and, if PRL wishes to include a modified version, to suggest modifications. *Id.* § 3.4(a).

PRL exercised comparable control over 707's customers. Section 6.1 generally prohibited 707 from selling Licensed Products to an account not already identified in the Agreement unless 707 submitted the proposed account and obtained PRL's Approval. *Id.*

§ 6.1(a); *see also id.*, Ex. D. Because such Approval rested in PRL's sole discretion, PRL possessed substantial authority over whether 707 could expand its distribution beyond the listed Approved Accounts.

707 plausibly alleges that PRL exercised these contractual powers for a purpose unrelated to the legitimate exercise of its contractual discretion and instead to impair 707's ability to sell Licensed Products. In particular, 707 alleges that PRL required it to continue using existing designs because new designs would compete with PRL's excess inventory; refused for more than a year to approve changes to allegedly undersized products despite repeated requests and evidence of poor sales; and delayed other approvals to prevent 707's products from interfering with PRL's efforts to liquidate that inventory. Am. Answer ¶¶ 126-39. Those allegations identify particular decisions contemplated by the Agreement, the manner in which PRL allegedly exercised its authority, and the asserted collateral reason for doing so.

The Dillards allegations provide an especially concrete example. 707 alleges that it secured an order from Dillards, an account that was not then an Approved Account, and requested PRL's Approval to add Dillards to the list of Approved Accounts. *Id.* ¶¶ 140-41. According to the Amended Answer, PRL employee Emily Mehlman responded in June 2023 that PRL would not approve Dillards because Ralph Lauren products "were not being sold" there, although Ralph Lauren products were in fact being sold at Dillards. *Id.* ¶ 142. 707 alleges that PRL gave that explanation, and withheld the requested Approval, because permitting the sale would have increased 707's sales, thereby hindering PRL's ability to rid itself of its excess inventory. *Id.* ¶ 143. Accepting those allegations as true, 707 alleges that PRL invoked its approval authority on a knowingly false premise to suppress the very sales the Agreement licensed 707 to pursue.

Nothing in the Agreement's grant of "sole discretion" requires dismissal of that theory. *Zest Anchors* rejected the proposition that such language categorically forecloses an implied-covenant claim. There, this Court explained that an express grant of sole discretion does not authorize a party to exercise that discretion "arbitrarily or irrationally in a manner that allegedly interfered with [the counterparty's] contract rights." 2025 WL 1591707, at *7 n.4. Similarly, *Southern Telecom* held that a licensor vested with "sole and absolute discretion" over product approvals could not allegedly use that discretion pretextually to defeat the licensee's ability to obtain the benefit of the bargain. 520 F. Supp. 3d at 509-10. That is, a party's sole discretion must be exercised in furtherance of the contractual process for which the parties conferred it, rather than as a pretext to defeat the counterparty's contractual rights. *See id.* at 510 (finding that application of the implied covenant "does not render the language 'sole and absolute discretion' illusory or meaningless" and instead "enforces the reasonable understanding of the parties").

That principle answers Plaintiffs' argument that 707 seeks to impose obligations absent from the Agreement. *See* Br. at 15-16; Reply at 10-11. To be sure, the implied covenant cannot require PRL to approve every new design, sizing proposal, retailer, or pricing request. Nor can it create a freestanding obligation to implement regional price locks or permit requested discounts if the Agreement otherwise leaves those matters to PRL. But Counterclaim IV does not depend on establishing that each requested action was itself contractually required. At least with respect to design and account approvals, 707 alleges that the Agreement gave PRL discretion over 707's ability to develop and sell the Licensed Products and that PRL deliberately exercised that discretion to suppress 707's sales for its own collateral purpose. *See* Am. Answer ¶ 143. Whether PRL had legitimate business or brand-management reasons for its decisions is a factual question that cannot be resolved on the pleadings. *See Zest Anchors*, 2025 WL 1591707, at *6 ("Whether [the claimant] will ultimately prevail when all of the facts are considered is another

question."). What matters at this stage is that 707 plausibly alleges that PRL exercised its discretion not to administer the licensed business, but to impede 707's sales so that PRL could dispose of competing inventory. Those allegations are sufficient at the pleading stage to state a claim for breach of the implied covenant of good faith and fair dealing. Plaintiffs' motion to dismiss Counterclaim IV is therefore denied.

## IV. Leave to Amend

707 requests leave to amend if the Court concludes that its fraud counterclaims do not adequately allege a duty to disclose. *See* Opp. at 17. Specifically, 707 proposes adding the allegation that "PRL knew that 707 was acting on the basis of mistaken knowledge concerning PRL's excess inventory of Licensed Products." *Id.*; *see* Dkt. 36-2 ¶¶ 93, 110. The Court denies that request because the proposed amendment would be futile.

While Rule 15 provides that "court[s] should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), denial of leave is appropriate where amendment would be futile, *see Veras v. N.Y.C. Dep't of Educ.*, No. 22-cv-00056 (JLR) (SN), 2024 WL 3446498, at *8 (S.D.N.Y. July 17, 2024) ("Nonetheless, 'it is within the sound discretion of the district court to grant or deny leave to amend,' and 'a district court may properly deny leave when amendment would be futile.'" (citation omitted) (first quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018); and then quoting *Jones v. N.Y. State Div. of Mil. & Naval Affs.*, 166 F.3d 45, 50 (2d Cir. 1999))), *aff'd*, No. 24-1956-cv, 2025 WL 2824851 (2d Cir. Feb. 6, 2025) (summary order), *cert. denied*, 146 S. Ct. 142 (2025). Amendment is futile when the amended claim "could not withstand a motion to dismiss." *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (citation omitted). To seek leave to amend, the movant "must . . . provide some indication of the substance of the contemplated amendment before a court could entertain the request." *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 624 (S.D.N.Y. 2014).

Here, 707's proposed amendment would not cure the defects identified in the Amended Answer. *See Armenante v. Flying Colours Corp.*, No. 25-cv-03378 (JLR), 2026 WL 775666, at *9 (S.D.N.Y. Mar. 19, 2026) (denying leave to amend where, "[g]iven the express terms of the [a]greement," the "proposed amendments would not resolve the pleading deficiencies").

As to Counterclaim I, the Court dismisses the claim because Section 2.9 specifically allocates to 707 the risk associated with the Licensed Products' sales and profit prospects, making 707's alleged reliance unreasonable. *See supra* Section II.A. Adding an allegation that PRL knew 707 held a mistaken belief about PRL's inventory would not alter the scope of the Agreement's specific disclaimer.

As discussed previously, the proposed allegation would likewise not save Counterclaim II. *See supra* Section II.B. To begin, it is conclusory. It merely states that PRL knew 707 was acting on mistaken knowledge but adds no facts identifying what 707 believed PRL's inventory level to be or explaining how PRL became aware of that belief. A recitation of an element does not become sufficient merely because it is inserted into an amended pleading. *See Iqbal*, 556 U.S. at 678 (noting that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough to survive dismissal).

More fundamentally, the proposed amendment does nothing to address the independent defect in 707's counterclaim: its failure to plead a duty to disclose on the part of PRL. *See supra* Section II.B. 707 does not propose to allege that it requested inventory information, that PRL refused such a request, or that some other circumstance prevented 707 from investigating a matter it now describes as central to its decision to contract and perform. The proposed language therefore would not establish a duty to disclose under the special facts doctrine even if the Court accepted it as adequately pleading PRL's knowledge.

707 has also already amended its counterclaims once in response to Plaintiffs' initial motion to dismiss. *See* Dkt. 21; Am. Answer. It now identifies the precise allegation it would add if given another opportunity to plead, allowing the Court to assess whether amendment could cure the defects identified in this Opinion. The Court finds that it cannot. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.").

Because 707's proposed amendment would not cure the grounds on which Counterclaims I and II fail, further amendment would be futile. The request for leave to amend is therefore denied, and Counterclaims I and II are dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to dismiss Defendant's counterclaims is GRANTED in part and DENIED in part. Counterclaims I and II are dismissed with prejudice for failure to state a claim on which relief can be granted. Plaintiffs' motion to dismiss Counterclaim IV is denied. Counterclaim III was not challenged by Plaintiffs and remains pending.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 30.

Dated: October 30, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge